UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE | ) |
| | ) Bankruptcy Case |
| BERJAC OF OREGON, | ) No. 12-63884-tmr7 |
| | ) |
| | ) MEMORANDUM OPINION |
| Debtor. | ) |

The matter before the Court concerns the propriety of a settlement between the case trustee and a law firm that provided services to the estate. The Office of the United States Trustee (UST) and various creditors (Objecting Creditors) objected to the settlement. For the reasons that follow, the objections will be overruled and the settlement approved.

Procedural History:

Debtor herein, Berjac of Oregon (Berjac), filed a voluntary Chapter 11 petition on August 31, 2012. Thomas Huntsberger (Huntsberger) was appointed Chapter 11 trustee. On October 2, 2013, the case was converted to a Chapter 7 liquidation. Huntsberger remained as trustee.

With Court approval, Huntsberger employed the firm of Bullivant Houser Bailey, PC (BHB), as his general counsel in both the Chapter 11 and 7 portions of the case. BHB filed fee applications totaling $1,215,286.51 (the Fee Applications). Huntsberger informally disputed BHB's fees and eventually came to a mediated settlement whereby BHB agreed to a significant reduction. Huntsberger filed a motion, and then an amended motion for approval of the settlement (Amended Settlement Motion). The UST and Objecting

MEMORANDUM OPINION-1

Creditors objected.[1] The UST as well as some of the Objecting Creditors also objected to the Fee Applications (Fee Objections), and the UST later moved to set aside or modify BHB's retention order (Motion to Set Aside).

The UST moved to abate the Amended Settlement Motion pending resolution of the Fee Objections and Motion to Set Aside. The Court denied that motion. Instead, it abated the Fee Objections and Motion to Set Aside pending resolution of the Amended Settlement Motion.

Huntsberger and BHB moved for summary judgment on the Amended Settlement Motion, which the Court denied. The Court then convened a multi-day evidentiary hearing. The Objecting Creditors were given a post-hearing opportunity to file further comments, which several have done. The Amended Settlement Motion is ripe for decision.

Facts:

Berjac began in the early 1960s as two separate general partnerships, "Berjac of Oregon" and "Berjac of Portland." Fred Holcomb (Fred) was one of the founding general partners. The businesses originally provided insurance premium financing. Fred's sons, Michael and Gary Holcomb, eventually became managing partners of Berjac of Oregon and Berjac of Portland respectively. To raise capital, both entities offered unregistered securities at a guaranteed interest rate to investors, most of whom were the Holcombs' business associates or friends. An account was set up for each investor who would make deposits and withdrawals like a quasi-bank account. Many investors had their life savings tied up in these accounts.

Huntsberger, as well as a large group of investors in a separate state court class action filed against related Berjac entities (the Class Action Plaintiffs), have alleged that Berjac's account activity constituted a Ponzi scheme, whereby new investor deposits were solicited to pay returns to prior investors in an effort to maintain the guise of a legitimate profit-making business. Allegedly, Berjac receipts were funneled to insiders and speculative real estate investments instead of to prudent and legitimate business activities.

---

[1] Some of the objections might be subject to timeliness concerns. In this ruling, the Court has considered all of the objections as though timely filed.

MEMORANDUM OPINION-2

When cash was insufficient to cover investor "calls," Berjac allegedly drew on credit-lines with various banks. Umpqua Bank (Umpqua) was one of Berjac's banks.

In July 2012, the month before Berjac's Chapter 11 filing, BHB switched banks to Umpqua and opened numerous checking and trust accounts.[2] Further, Umpqua extended or facilitated the following credit to BHB:

(1) two irrevocable standby letters of credit, one for $75,000 and the other for $149,459, both for the benefit of BHB's landlords;
(2) a $2,700,000 operating line of credit, renewable annually;
(3) a $600,000 capital expenditure line of credit;
(4) two term loans for $600,000 and $300,000 respectively; and
(5) a credit card with a $35,000 credit limit through Elan Financial Services.

The credit was issued on arms-length commercial terms and managed by conventional account managers.

Shortly after merging the two businesses, Berjac filed its Chapter 11 petition. It scheduled over $43,000,000 in general unsecured debt owing to more than 400 investors. On September 19, 2012, an order was entered approving Huntsberger's appointment as Chapter 11 trustee, and the next day the UST made the appointment.

On September 26, 2012, Huntsberger applied to employ BHB as his general counsel (BHB Employment Application), and specifically named Thomas A. Gerber (Gerber) who was "of counsel" to the firm. The BHB Employment Application was accompanied by Gerber's Declaration and Bankruptcy Rule 2014 Verified Statement. The Declaration stated Gerber held no "interest adverse to the bankruptcy estate" and was a "disinterested person as defined in 11 USC § 101(13)[3] [sic ]."[4] UST Ex. 4 at 5. The Rule 2014 Statement indicated Gerber had "read 11 U.S.C. § 101(14) and 327, and FRBP 2014(a); and the applicant's

---

[2]BHB's previous bank was Bank of the West (BOTW). For many reasons the firm suffered decreasing revenues while in that relationship, particularly from 2011-2012. Its credit portfolio was eventually assigned to a special assets group which dealt with higher risk loans. Nevertheless the firm was generally meeting its obligations.

[3]Unless otherwise indicated, all subsequent statutory references are to Title 11 of the United States Code.

[4]The term "disinterested person" is defined in § 101(1<u>4</u>) (emphasis added).

MEMORANDUM OPINION-3

firm has no connections with . . . any party in interest." UST Ex. 4 at 6. Gerber also acknowledged he "ha[d] a duty during the progress of the case to keep the court informed of any change" and that in the event any changes occur he would "immediately . . . file with the court an amended verified statement." Id. at 7. Neither the Declaration nor the Rule 2014 Statement made any reference to Umpqua.

On October 2, 2012, the Court entered an order authorizing Huntsberger to employ Gerber and BHB as his general counsel with an effective date of September 19, 2012.

On October 4, 2012, the § 341(a) meeting of creditors was convened.[5] At that meeting, Michael Holcomb identified Umpqua as one of several banks who had provided lines of credit to Berjac. BHB then became interested in investigating claims against Berjac's banks and other closely-connected entities. While Gerber was lead attorney handling Berjac matters, BHB assigned the investigation and possible prosecution of these "third party" claims to a team of BHB attorneys including Thomas Hutchinson (Hutchinson) and Laura Taylor (Taylor). Possible claims included those based on fraudulent transfer and "aiding and abetting" theories. Before beginning their investigation, BHB attorneys ran conflicts checks which identified Umpqua as a possible adverse and/or opposing party. However, the firm concluded no disqualifying conflict existed.

Between December 2012 and March 2013, BHB obtained various orders under FRBP 2004 requiring many of the third parties, including Umpqua, to produce records. As a matter of courtesy, BHB decided to forewarn Umpqua if and when it would be served with discovery requests. In January 2013, Hutchinson sent Huntsberger an analysis of potential third-party claims. In this analysis, and in internal e-mails, BHB labeled Umpqua as a litigation target.

On October 2, 2013, the case was converted to a Chapter 7 liquidation. Orders were entered retaining Huntsberger as trustee and BHB as his counsel.

Because discovery was exceptionally voluminous and Berjac's records were in complete disarray, BHB proceeded against the third party "targets" with caution. The litigation team was aware, however, that

---

[5]The meeting was continued to sessions on October 26, 2012, and November 8, 2012.

MEMORANDUM OPINION-4

the statute of limitations on many claims would likely run on August 31, 2014, the two-year anniversary of the Chapter 11's filing.

Huntsberger recalled first becoming aware of BHB's and Umpqua's banking relationship in April 2014. During that month, BHB declined the opportunity to represent Umpqua in an unrelated matter because it felt it had a potential conflict. On April 28, 2014, BHB's Board of Directors (Board) met and decided BHB should not sue Umpqua. According to the testimony, this was a decision based on business, not ethical, considerations. The Board was concerned that because of BHB's banking relationship with Umpqua, Huntsberger's decisions going forward would be second-guessed and that this might become a distraction.

On May 16, 2014, Hutchinson sent Huntsberger a letter recommending that he retain separate counsel to evaluate and pursue claims against Umpqua. The letter acknowledged BHB's relationship with Umpqua and stated that "[a]lthough our trial team is dedicated to zealously advocating for you and the Estate, we are concerned about the potential that it could appear that our firm was not completely zealous in its evaluation and pursuit of any claims against Umpqua because of this relationship." BHB Ex. 352 at 1. Hutchinson offered the firm's assistance to enable any transition to new counsel free of charge.

In light of Hutchinson's letter, Huntsberger decided to transfer all Berjac matters to another firm, Tarlow Naito & Summers, LLP (TNS), and notified BHB to cease all work by June 1, 2014, not coincidentally, the date Gerber joined TNS. Orders were subsequently entered authorizing TNS' employment as the trustee's general counsel.[6] Another firm, Kent & Johnson, LLP (Kent & Johnson), was employed as special counsel to, among other things, evaluate and pursue the third-party claims. To confirm it had been terminated as the estate's counsel, on July 17, 2014, BHB filed a notice of withdrawal.

On August 28, 2014, Huntsberger, through Kent & Johnson, filed an adversary complaint against three banks, including Umpqua, and against Berjac's former accountant (the Adversary Proceeding).

---

[6]Gerber also filed a Notice of Substitution of Counsel on June 18, 2014. None of the documents related to the transition of the legal work from BHB to TNS made any reference to Umpqua or a possible conflict or connection.

MEMORANDUM OPINION-5

From the beginning of their banking relationship, BHB has seen Umpqua as a possible source of referrals and has not been shy about marketing itself toward that end. While BHB served as the trustee's general counsel, some firm members socialized with Umpqua executives. One of BHB's Board members, Dick Whittemore (Whittemore), maintained a personal friendship with an Umpqua executive, Brad Bleything. The friendship predated BHB's relationship with Umpqua and continued until Whittemore's death in 2015. Whittemore, however, did not work on any Berjac matter.

During the course of BHB's engagement, one of its standby letters of credit with Umpqua expired. The highest intra-month balance on the operating credit-line was $476,454. That line had month-end zero balances except for three months, where the balances were $6,585, $59,382, and $99,638 respectively. The operating credit-line has been renewed annually. BHB never drew against its capital expenditure line. It paid the two term notes according to their terms, with payoffs in August 2015.

BHB filed an interim fee application for $630,039.25 (which it subsequently stipulated to reduce to $603,111.25), and a final fee application for an additional $266,925.67, for a total of $870,036.92 in Chapter 11 fees and expenses. It also filed a fee application for $345,249.59 in Chapter 7 fees and expenses. It thus sought a total of $1,215,286.51, of which it has received $587,063.53 on an interim basis.[7]

At the UST's behest, Huntsberger directed TNS to review BHB's fees. TNS concluded the fees were objectionable on multiple grounds including FRBP 2014 disclosure and § 327(a) adverse interest/lack of disinterestedness issues. In September 2015, and before any formal objections were filed, Huntsberger and BHB participated in a two-day mediation with Hon. Michael Hogan (ret.), and bankruptcy attorney and trustee Ford Elsaesser. The UST declined an invitation to participate. Before the mediation, TNS did extensive settlement preparation, exhaustively examining the merits and deficiencies of the objections, as well as the costs to the estate of litigating them. As a result of the mediation, Huntsberger and BHB reached a settlement whereby BHB agreed to reduce its fees by $300,000. That settlement is the subject of the Amended Settlement Motion.

---

[7]Absent approval of the Amended Settlement Motion, any interim awards would be subject to further review and final approval. § 330(a)(5).

MEMORANDUM OPINION-6

With the Court's encouragement, on November 16, 2015, BHB filed its 1st Supplemental Rule 2014 Statement. The 1st Supplemental Statement disclosed BHB's banking and lending relationship with Umpqua. It noted that certain firm members, including a member of the Board, had personal relationships with certain Umpqua executives. It also advised of the Board's decision in April 2014 not to prosecute claims against Umpqua and of its subsequent recommendation that special counsel be retained.

Huntsberger eventually reached a court-approved settlement with Umpqua that will result in an $11 million payment to be split between the estate (40%) and Class Action Plaintiffs (60%).[8] In addition, Huntsberger reached court-approved settlements with the other Adversary Proceeding defendants which will garner a minimum of $6.25 million to be split between the estate and Class Action Plaintiffs.

<u>Analysis</u>:[9]

The guideposts for court approval of a settlement are set out in <u>Martin v. Kane (In re A & C Props.)</u>, 784 F.2d 1377, 1381 (9th Cir. 1986). A settlement's proponent has the burden to convince the court by a preponderance of evidence that the settlement is fair, equitable, and reasonable. <u>Id.</u> In evaluating those criteria, the bankruptcy court must consider:

(1) the probability of success in the litigation;
(2) the difficulties, if any, to be encountered in the matter of collection;
(3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

<u>Id.</u> These factors are considered as a whole; that is, no one factor is considered in a vacuum and no one factor is dispositive. <u>Greif & Co. v. Shapiro (In re W. Funding Inc.)</u>, 550 B.R. 841, 851 (9th Cir. BAP

---

[8]The "split" is somewhat illusory as the estate's creditors and the Class Action Plaintiffs are, for practical purposes, identical.

[9]Several expert witnesses testified on behalf of Huntsberger and BHB. Each expert produced a report which was admitted into evidence. To the extent that testimony and those reports addressed legal standards or conclusions, the Court will treat them as argument. <u>Vejo v. Portland Pub. Sch.</u>, 204 F. Supp.3d 1149, 1161 (D. Or. 2016) (an expert may not give an opinion on an ultimate legal conclusion); <u>In re Jore Corp.</u>, 298 B.R. 703, 731 (Bankr. D. Mont. 2003) (disclosure standards under FRBP 2014 are for the court to determine).

MEMORANDUM OPINION-7

2016). The court may also consider any other factor bearing on the wisdom of the compromise. A & C Props., 784 F.2d at 1381 (citing with approval Matter of Jackson Brewing Co., 624 F.2d 605, 607 (5th Cir. 1980)); In re Smith, 349 B.R. 28, 36 (Bankr. D. Idaho 2005) (court may consider any other factor relating to whether the compromise is fair and equitable).

In assessing a compromise, the court need not rule on disputed facts and questions of law, but rather need only canvass the issues. Burton v. Ulrich (In re Schmitt), 215 B.R. 417, 423 (9th Cir. BAP 1997). Indeed, "[a] mini trial on the merits is not required." Id. Rather, "the bankruptcy court's function is 'to examine the proposed settlement to determine if it falls below the lowest point in the range of reasonableness.'" Redwood Tr. v. Am. Bldg. Storage, LLC (In re Am. Bldg. Storage, LLC), 2007 WL 7532281, *5 (9th Cir. BAP Apr. 2, 2007) (quoting In re Hydronic Enter., Inc., 58 B.R. 363, 366 (Bankr. D. R.I. 1986)). As explained:

> A trustee seeking approval of a settlement is not required to prove it would have been impossible to obtain a superior result by trying the case. If this were required, the settlement approval process would degenerate into a trial of the underlying claims, which would defeat the purpose of settling. . . . It would also frustrate negotiations, because it would prevent the trustee from making any material concessions in the interest of compromise. The settlement amount was the product of negotiation and compromise and was not presented as a conclusive determination of the merits of the claims being settled.

Shapiro, 550 B.R. at 852 (internal citation and quotation omitted).

Threshold Requirements:

Before turning to the A & C factors, the Court must be satisfied Huntsberger's decision to settle was made in good faith, In re Rake, 363 B.R. 146, 152 (Bankr. D. Idaho 2007), after diligent investigation. In re Hyloft, Inc., 451 B.R. 104, 110 (Bankr. D. Nev. 2011). Those threshold considerations have been easily satisfied. This was no "lunch napkin" deal. The settlement resulted from a lengthy mediation with two experienced mediators, before which Huntsberger's counsel exhaustively analyzed the merits of the underlying disputes and the costs and risks attendant to litigating them. Despite that analysis, counsel conceded the mediation process exposed weaknesses in his initial positions.

// // //

MEMORANDUM OPINION-8

Further, Huntsberger, a bankruptcy trustee for 36 years and himself an attorney, independently weighed the various factors. His testimony convincingly demonstrated his bona fides and loyalty to the creditor body. He was especially aware that time was of the essence because many of the investors are elderly and had been devastated financially.

A & C Factor #1: Probability of success:

Factor #1 requires examination of the probability of success in the litigation. Based on the parties' submissions, the Court must probe three main areas:

(1) BHB's qualification for employment;
(2) the adequacy of BHB's disclosures; and
(3) the reasonableness of BHB's fees and expenses.

a) BHB's qualification:

Attorneys cannot have divided loyalties. This is especially true for those who work for bankruptcy estates. Thus, an attorney employed by an estate: 1) cannot hold or represent an interest adverse to the estate, and 2) must be a disinterested person. § 327(a). In turn, a "disinterested person" in pertinent regard is someone who "does not have an interest materially adverse to the interest of the estate . . . by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." § 101(14)(C).

The "no adverse interest" and "disinterestedness" criteria substantially overlap, Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347 B.R. 679, 687-688 (9th Cir. BAP 2006), and preclude representation of conflicting interests. Id. Determination of whether an adverse interest exists requires a totality-of-the-circumstances, fact-driven inquiry. Dye v. Brown (In re AFI Holding, Inc.), 530 F.3d 832, 848-849 (9th Cir. 2008), aff'g and adopting, 355 B.R. 139 (9th Cir. BAP 2006). If a professional has an adverse interest during his retention, his compensation may be denied. § 328(c); In re Farrington, 2007 WL 4365753, *7 (Bankr. D. Or. Dec. 11, 2007).

Neither the Bankruptcy Code nor Rules define "adverse interest." Several courts have used the state bar ethical rules of the forum court as guidance. Tevis, 347 B.R. at 688 (bankruptcy court should look to state's ethical rules); Farrington, 2007 WL 4365753 at *8 (same); In re Kobra Props., Inc., 406 B.R. 396,

MEMORANDUM OPINION-9

403 (Bankr. E.D. Cal. 2009) ("adverse interest" although arguably a federal question, is informed by reference to forum state's ethical rules). The parties dispute whether those rules, here the Oregon Rules of Professional Conduct (ORPCs), control or simply set a minimum standard. The Court need not answer that question as it need not resolve merits disputes. Instead, in the present context its task is to deal in probabilities. Suffice it to say that by any standard it is highly probable BHB was qualified at all material times to represent the estate.

First, it is undisputed BHB never <u>represented</u> an entity with an arguably adverse interest. Thus to be disqualified, it must have personally held such an interest. In that regard:

> A generally accepted definition of "adverse interest" is the (1) possession or assertion of an economic interest that would tend to lessen the value of the bankruptcy estate; or (2) possession or assertion of an economic interest that would create either an actual or potential dispute in which the estate is a rival claimant; or (3) possession of a predisposition under circumstances that create a bias against the estate.

<u>Dye</u>, at 845. The UST and Objecting Creditors argue BHB's banking relationship, and especially its credit arrangements,[10] with Umpqua disqualify the firm on all three of the above bases. The Court disagrees.

As to the first two bases, clearly the credit arrangements in and of themselves did not lessen the estate's value or create an actual or potential dispute in which the estate was a rival. BHB was not the estate's debtor, it was Umpqua's. The last disjunctive test asks whether BHB held a "predisposition under circumstances that create[d] a bias against the estate," <u>Id.</u>, that is, whether it was plausible the credit arrangements would cause the firm to act any differently than it otherwise would. <u>Gosser v. Arkison (In re Hammer)</u>, 2007 WL 7540944, *6 (9th Cir. BAP 2007). These inquiries dovetail with ORPC 1.7(a)(2). That Rule prohibits an attorney from representing a client if the representation involves a current conflict, which exists, among other circumstances, if "there is a significant risk that the representation . . . will be materially limited . . . by a personal interest of the lawyer."

// // //

---

[10]Neither the UST nor Objecting Creditors seriously contend that BHB's various deposit and checking accounts disqualified it from representing the estate.

MEMORANDUM OPINION-10

A merits determination after a fact-intensive review would likely find BHB had no disqualifying adverse interest; that is, there was no significant risk, i.e., likelihood, In re Conduct of Spencer, 355 Or. 679, 692, 330 P.3d 538, 545 (2014), that its representation of the estate would be materially limited by virtue of its relationship with Umpqua. The credit extended was on arms-length commercial terms. BHB's representation of an adverse party in litigation was not grounds for Umpqua to declare a default under any of the credit arrangements. At no material time did Umpqua offer any forbearances or other special terms. At most, Umpqua could have declined to renew the operating and capital expenditure credit-lines. However, that threat would have been an empty one. Despite earlier financial difficulties, BHB had righted itself so that it could have obtained the same credit terms at a different bank. This is borne out by the firm's actual borrowings. It never used the capital expenditure line and only used the operating credit line as essentially a cash substitute, carrying no or de minimus monthly balances forward.

At bottom line, BHB was never beholden to Umpqua in any way.[11] Up until the Board's decision in April 2014, BHB's litigation team actively and zealously pursued all third parties, including Umpqua. Its firm members credibly testified that BHB's ultimate decision was made to protect its business interests and the appearance of under-zealous representation.

The UST points to certain firm e-mails, especially from Whittemore, which purportedly show BHB's divided loyalty. See, e.g., UST Exs. 13, 32, 67. Had Whittemore handled Berjac matters, those e-mails might be persuasive, as they showed what may be charitably characterized as oversolicitous exuberance towards Umpqua. But Whittemore was removed from the fray and his personal bias was not attributable to the entire firm. ORPC 1.10(a); U.S. Trustee v. S.S. Retail Stores Corp. (In re S.S. Retail Stores Corp), 211 B.R. 699, 703-704 (9th Cir. BAP 1997) (no firm-wide attribution for purposes of §§ 101(14) and 327(a)).
// // //

---

[11]There was also little or no incentive, vis-a-vis its relationship with Umpqua, for BHB to run up fees from the Berjac estate. Except for a 6-month window, fees payable by the Berjac estate were not part of BHB's borrowing base. Even during the window, the financials reveal the Berjac receivable was irrelevant to BHB's borrowing capability.

MEMORANDUM OPINION-11

Even if BHB was found in a merits hearing to have an adverse interest on matters relating to Umpqua, the Court would still have discretion to compensate it for services unconnected to the conflict. Mehdipour v. Marcus & Millichap (In re Mehdipour), 202 B.R. 474, 478 (9th Cir. BAP 1996), aff'd, 139 F.3d 1303 (9th Cir. 1998). Although the exact amount of non-Umpqua-related fees are in dispute, they nevertheless account for the great majority of those applied-for. Further, another line of authority allows compensation of a later-disqualified professional if the professional relied in good faith on the order authorizing its employment. First Interstate Bank of Nevada, N.A. v. CIC Inv. Corp. (In re CIC Inv. Corp.), 192 B.R. 549, 553 (9th Cir. BAP 1996). Both of these possibilities create uncertainties in any merits hearing and are thus factors favoring settlement.

b) BHB's disclosures:

FRBP 2014(a) requires that an application to employ a professional, as well as the professional's accompanying verified statement, disclose among other things "all of . . . [the proposed professional's] connections with the debtor, creditors, [and] any other party in interest." All such connections, no matter how irrelevant or trivial they seem, must be disclosed. Mehdipour, 202 B.R. at 480. A professional's duty to disclose is a continuing one. Hughes v. Fukushima (In re Raj Kamal Corp.), 2013 WL 6671493, *5 (9th Cir. BAP Dec. 17, 2013). The disclosures are required in large part to determine whether a professional meets the "no adverse interest" and "disinterestedness" requirements. Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.), 63 F.3d 877, 881 (9th Cir. 1995). The requirements are applied strictly. Id. at 881-882. Even negligent or inadvertent failures may result in adverse consequences, Id. at 882, "even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." Id. at 880.

It is highly likely the Court would conclude in a merits hearing that BHB violated its continuing duty to disclose. BHB argues that, as a matter of practice in this District, professionals do not disclose commercial banking relationships. One of its witnesses conducted a survey of Rule 2014 statements between 2010-2012, and found only a few instances where such relationships were disclosed. That evidence, while perhaps relevant to BHB's intent, is irrelevant to the legal standard which requires the disclosure of all

MEMORANDUM OPINION-12

connections, no matter how trivial. Even though at arms-length and in the ordinary commercial course, considering the extent of its then-current and potential borrowings, it is highly probable BHB's credit relationship with Umpqua rose to the level of a "connection" that was beyond trivial.[12] The Court, however, declines any invitation to determine exactly when disclosure should have been made. Part of that analysis involves ascertaining at what point an entity becomes a "party in interest" for purposes of FRBP 2014.[13] Settlements are reached to avoid those types of issues.

However, at absolute minimum there should have been disclosure immediately after the Board's April 28, 2014, decision which led directly to BHB's termination. It took more than a year and half, and at the Court's suggestion, for BHB to make that disclosure.

Bankruptcy courts have wide discretion in designing appropriate remedies for disclosure violations, APJL Consulting, LLC v. Treasures, Inc. (In re Treasures, Inc), 2015 WL 925957, *17 (9th Cir. BAP March 3, 2015), including denial or reduction of fees. Neben & Starrett, 63 F.3d at 882. In determining an

---

[12] Again, the Court is not called upon to decide the merits of any disclosure issues, but here expresses doubts that a mere checking or savings account or a "low dollar" credit-line on commercial terms, would rise to the level of a necessary disclosure.

[13]   The Bankruptcy Code utilizes the term "party in interest" in multiple places, but never provides a precise definition. This lack of precision is intentional as indicated by the legislative history: Rules of bankruptcy procedure or court decisions will determine who is a party in interest for the particular purposes of the provision in question. . . . Thus, in the context of a bankruptcy, a "party in interest" is: an expandable concept depending on the particular factual context in which it is applied.

. . . .

Thus, courts considering party-in-interest status in connection with various bankruptcy related issues have identified relevant factors as: a practical stake in the outcome; an actual pecuniary interest in the case; a pecuniary interest and practical stake; and impact in any significant way. And this finding may be situational and decided on a case-by-case basis.

In re Owen-Moore, 435 B.R. 685, 690-691 (Bankr. S.D. Cal. 2010) (internal citations and quotations omitted).

MEMORANDUM OPINION-13

appropriate sanction, some courts have been guided by a list of factors, including whether the undisclosed connections were disqualifying, inadvertent, material, and/or remedied, and whether the professional's services benefitted the estate. In re Sportsman's Link Inc., 2012 WL 2998410, *4 (Bankr. S.D. Ga. 2012).

Several of these factors cut against a significant sanction, some cut in favor. As discussed above, it is highly unlikely BHB's connections were disqualifying. Further, it is highly unlikely its non-disclosure was willful. There was simply no "smoking gun" or even circumstantial evidence that BHB attempted to conceal its relationship with Umpqua from the Court, Huntsberger, or the estate's creditors. The firm dutifully ran conflicts checks. The "third-party claim" litigators were not bankruptcy specialists and relied on Gerber to make the required disclosures. In turn, Gerber believed the relationship was "routine" and, as such, did not believe disclosure was necessary. That commercial banking relationships are not, as a matter of course, disclosed in this District is also probative of BHB's lack of intent to conceal. And, as discussed below, BHB's services significantly benefitted the estate.

On the other hand, the undisclosed connections were likely material, Sportsman's Link, 2012 WL 2998410 at *5, and had they been disclosed, it is likely much of the present expense and litigation could have been avoided. In that regard, BHB only remedied its omissions at the Court's suggestion, and even then long past when Huntsberger had terminated the firm's retention.

The Court, thus, finds it likely a sanction would be imposed in a merits hearing. However, that sanction would come nowhere near the total fee denial advocated by the UST and most of the Objecting Creditors. Rather, a 15-25% sanction would seem more appropriate.

c) BHB's fees:

Although the UST's initial objections to both the Amended Settlement Motion and the Fee Applications specifically attacked many of the applied-for fees, those objections were largely abandoned at the evidentiary hearing. Nevertheless, the Court will touch on the probability of approving BHB's fees in a merits hearing.

// // //

MEMORANDUM OPINION-14

Section 330(a)(1) authorizes the court to award an attorney employed under § 327 "reasonable compensation for actual, necessary services," § 330(a)(1)(A), and "reimbursement for actual, necessary expenses." § 330(a)(1)(B). In making its award the court must consider "the nature, the extent, and the value" of the services, "taking into account all relevant factors." § 330(a)(3). Several of those factors are listed in the statute. § 330(a)(3)(A)-(F), (4)(A)(i)-(ii). The services need not necessarily result in a material benefit to the estate to be compensable. Instead, given the plain language of § 330(a)(3)(C), the attorney "need demonstrate only that the services were reasonably likely to benefit the estate at the time rendered." Ferrette & Slater v. U. S. Trustee (In re Garcia), 335 B.R. 717, 724 (9th Cir. BAP 2005). The primary method to determine a reasonable fee is to calculate the "lodestar," by multiplying the number of hours reasonably expended by a reasonable hourly rate. Law Offices of David A. Boone v. Derham–Burk (In re Eliapo), 468 F.3d 592, 598 (9th Cir. 2006).

BHB performed a wide range of legal services during its 21-month retention, including: (1) analyzing Berjac's extensive and various types of assets, (2) identifying and pursuing preferential transfers, (3) investigating[14] and analyzing potential claims against third parties, (4) reviewing and analyzing insurance premium finance accounts, (5) working with Huntsberger on asset disposition, including the sale of numerous parcels of real property and businesses, (6) advising on business licensing issues, (7) conducting legal research on a broad range of topics, and (8) responding to subpoenas.

The great majority of BHB's fees were unrelated to the estate's claims against Umpqua. Under the above standards, it is highly probably in a merits hearing the Court would allow the bulk of "non-Umpqua" fees. The evidence adduced indicates that almost $12 million in cash and claim credits was collected/negotiated by the estate outside of the Adversary Proceeding. Much of that credit goes to Mr.

---

[14] BHB's investigative work should not be underestimated. The firm worked hand-in-hand with a forensic accountant to successfully unravel hundreds of thousands of disorganized Berjac financial documents. Further, it was BHB's discovery efforts that exposed what some have characterized as "smoking gun" internal Umpqua e-mails arguably showing the Bank knew about Berjac's so-called Ponzi scheme. Trustee's Ex. T.

MEMORANDUM OPINION-15

Gerber, and much of his work was while with BHB.  Further, Huntsberger testified the transition from BHB to TNS was seamless.[15]

As for fees related to the third-party claims, there is also no reason to conclude the great bulk would not be approved.  Although the Board's timing could have been better, it is evident BHB's work was not wasted.  A simple review of the theories pled in the Adversary Proceeding confirms this.

One other issue deserves brief discussion.  The UST has argued at one point or another that issues concerning BHB's qualification and disclosures, as well as those involving the reasonableness of its fees, cannot be "settled" as a matter of law.  It argued that by approving the settlement, the Court would be shirking its independent duty to review those matters.  Early in these proceedings, the Court held otherwise, citing instances where the UST itself had settled such matters, see, e.g., In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005),[16] and opining that all contested issues would be adequately vetted within the context of the Amended Settlement Motion.  To no one's surprise, that pronouncement proved accurate.

Since the settlement was noticed, the UST took at least nine depositions.  Thousands of pages of documents were produced in discovery.  The evidentiary hearing on the settlement lasted four and a half days.  Seventeen witnesses were called and over 250 exhibits admitted.  At the hearing's end, the UST conceded it would produce no additional evidence in a merits hearing.  The Court has carefully reviewed the evidence, and finds it deficient even on a merits review.

// // //

---

[15] BHB has conceded certain fees incurred during the transition are non-compensable.

[16] See also Trustee's Ex. X, which is a true copy of a motion filed on May 24, 2005, to approve a settlement between the UST, the case trustee, and the law firm of Perkins Coie, LLP in In re Jore Corp., Case #01-31609-7 (Bankr. D. Mont.).  The firm's fees had been disallowed and its retention order vacated because of a disclosure violation.  Jore Corp., 298 B.R. at 732.  The parties entered into the subject settlement while appeal was pending before the Ninth Circuit Court of Appeals.  The appeal was subsequently dismissed, conditioned on both the District and Bankruptcy Courts approving the settlement.  The District Court did so.  Trustee's Ex. X in part is the Motion to Approve the Settlement filed before the Bankruptcy Court.  The parties did not supply this Court with the record indicating whether or not that Motion was ultimately granted.

MEMORANDUM OPINION-16

A & C Factor #2: Difficulties in collection:

Factor #2 requires consideration of the difficulties, if any, to be encountered in collection. To a certain extent this factor is irrelevant as the present matter involves an administrative fee claim against the estate, not a claim by the estate against a third party. However, to the extent collection might involve disgorgement of interim fees paid, the issue was resolved on summary judgment where the Court found as an established fact under FRCP 56(g) that BHB could respond in full satisfaction to any disgorgement order.[17] This factor, thus, cuts against approving the settlement.

A & C Factor #3: Complexity, expense, inconvenience, and delay:

Factor #3 looks to the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it. Based on the evidence presented, these factors weigh heavily in favor of approving the settlement.

That the merits of the underlying fee and employment issues are complex is, frankly, an understatement. The UST's own investigation belies any claim to the contrary. The Court gives little regard to any argument that, in light of the evidence now in the record, the issues have been greatly simplified. One cannot conduct exhaustive discovery and force a multi-day hearing, and then rely, in essence, on a fait accompli. To do so would allow an objector to scuttle a settlement by engaging in the very behavior the settlement was meant to avoid. Further, BHB has not conceded its own discovery is complete, and has reserved the right to adduce further testimony and documentary evidence at a full evidentiary hearing on the merits, should the settlement not be approved.

So far, the estate has incurred over $200,000 in fees on this matter. While those fees are subject to review and allowance, they are nevertheless telling. The UST has argued the bulk of the fees could have

---

[17]One matter should be clarified for the record. In its summary judgment ruling, the Court stated that BHB had received approximately $310,000 in interim distributions. However, that figure was only the amount of interim fees paid for Chapter 11 work. When Chapter 7 work is added, the total interim fees paid approximate $587,000.00. That said, the Court will not revisit its summary judgment finding, as no party then or now has contended BHB could not respond in full satisfaction to a disgorgement order, be it $310,000 or $587,000.

MEMORANDUM OPINION-17

been avoided had the estate simply stepped aside and let the UST prosecute its fee and employment objections.[18] However, it is unlikely a trial on the merits would have improved the estate's position. Further, trial would have been at least a week-long affair. Simply sifting through the Fee Applications for reasonableness would have taken days. Even assuming Huntsberger and/or the UST succeeded in reducing BHB's fees beyond the current $300,000 discount (plus any reasonable fees incurred by the estate in investigating and prosecuting its objections), the dispute would not have ended. BHB has already incurred over $400,000 in attorney's fees. To the firm this is about more than money. Its ethical standards and reputation have been impugned. The Court has no doubt BHB will expend whatever it deems necessary to clear its name, including prosecuting whatever appeals are available. By necessity that would lead to further uncertainty and perhaps years of delay.

A & C Factor #4: Paramount interest of creditors; proper deference:

Factor #4 requires consideration of the paramount interests of creditors and deference to their reasonable views. The creditors' paramount interest "reflects not only [their] desire to obtain the maximum possible recovery but also their competing desire that recovery occur in the least amount of time." In re Marples, 266 B.R. 202, 207 (Bankr. D. Idaho 2001). "This factor is thus interwoven with considerations of expense, delay, and risk," Id., which, as discussed above, bode in favor of the proposed settlement. The present litigation could potentially tie up $1.2 million; the settlement allows $300,000 to reach claimants now.

The Court must also accord proper deference to creditors' reasonable views. It need not, however, give all such views equal weight, John S. Marandas, P.C. v. Bishop (In re Sassalos), 160 B.R. 646, 654 (D. Or. 1993), and opposing views are not controlling. A & C Props., 784 F.2d at 1382.

The great majority of claimants, either by number or amount, did not object to the notice of the Amended Settlement Motion. In ruling on summary judgment, the Court cited caselaw describing this

---

[18]The evidence indicates the estate incurred approximately $40,000 in fees through the mediation. Assuming only a monitoring function thereafter, it would likely have cost the estate at least $50,000-$60,000 even if it had stepped aside.

MEMORANDUM OPINION-18

silence as connoting an "equivocal" position. Rake, 363 B.R. at 155. However, it also noted that on summary judgment it was bound to give the non-moving parties the benefit of all reasonable inferences. That stricture does not now apply. The Court therefore finds the creditors' lack of objection implies at least their tacit approval. Further, there is evidence in the record that two large creditor groups affirmatively support the settlement.

The Objecting Creditors both in number and amount, represent a distinct minority of the creditor body. That said, according proper deference requires more than simply counting the number of claimants or dollar amount of claims for and against the settlement. The Court appreciates the Objecting Creditors' positions, and recognizes the time, often at personal expense, each of them has taken to promote those positions.

The root of the word "credit" comes from the latin "credere," http://www.etymonline.com/index.php?term=credit, meaning "belief or trust." http://latindictionary.wikidot.com/verb:credere. Debtor and its principals shattered that trust, so it is easy to see how the investors view the bankruptcy process with a jaundiced eye. Although Huntsberger has estimated an eventual 50% dividend, that is little solace to those who had their life savings invested in Berjac. Nevertheless, the Objecting Creditors' positions largely mimic the UST's, which for the reasons described, simply do not carry the day.

Other Factors:

The Adversary Proceeding was pending during the dispute over BHB's fees. Huntsberger and his counsel soon realized that his attorney-client privilege with BHB (including the protection of work-product) would be waived once formal fee objections were filed, and that, as a result, certain information might come to light that would jeopardize the estate's position in the Adversary Proceeding. There was, thus, a tactical reason to settle aside from compromising the discrete dispute with BHB. That more than $16,000,000 (gross), two-thirds of which came from Umpqua, will eventually be obtained for creditors as a

// // //

// // //

MEMORANDUM OPINION-19

result of settlements of the Adversary Proceeding claims is at least circumstantial evidence that Huntsberger's strategy was a sound one.[19]

Conclusion:

The law favors compromise. A & C Props., 784 F.2d at 1381. However, to protect the various constituencies in a bankruptcy case, the law requires that any compromise by an estate representative be fair, reasonable, and equitable. Balancing all relevant factors and for the above reasons, the settlement at bar is all three. The Court will enter an order granting the Amended Settlement Motion, overruling the Fee Objections with prejudice, and denying the Motion to Set Aside with prejudice.

This Opinion constitutes the Court's findings of facts and conclusions of law under FRBP 7052.

THOMAS M. RENN
Bankruptcy Judge

---

[19]Under the settlements, Umpqua is to pay $11,000,000, defendant Pacific Continental Bank is to pay approximately $5,000,000, and defendant Jones & Roth PC is to pay $1,250,000 (with an additional $3,550,000 in possible recovery against Jones and Roth PC's insurers). These gross proceeds are to be split in varying percentages between the Class Action Plaintiffs and bankruptcy estate. However, the Class Action Plaintiffs and the estate's unsecured creditors essentially overlap.

MEMORANDUM OPINION-20